Filed 3/20/26  In re A.J. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | B342306 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.W. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. 24CCJP02224A) |

APPEALS from an order of the Superior Court of Los Angeles County, Cathy J. Ostiller, Judge.  Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant D.W.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant A.M.

Office of the County Counsel, Dawyn D. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah

Vesecky, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

D.W. (Father) and A.M. (Mother) challenge the sufficiency of the evidence supporting the juvenile court's exercise of jurisdiction over their daughter, A.J. (born 2017). Father also challenges the disposition order removing A.J. from his custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral and Petition*

In June 2024 the Los Angeles County Department of Children and Family Services (Department) received a referral alleging that seven-year-old A.J. threatened to kill several students. During a risk assessment by a therapist, A.J. disclosed Mother and Father "hit her with a belt all over her body." A.J. also told the therapist that her stepmother, Courtney, hit her in her mouth and "all over her body." The police found marks on A.J.'s body, including on her wrists and thighs, and scars on her back.

A social worker interviewed A.J., who repeated that both parents hit her with a belt. She reported Mother had hit her with the hard part of a hairbrush and a sandal. A.J. said these incidents happened a long time ago, but she did not remember when. A.J. denied being afraid of Mother but said she cried when Mother hit her and that Mother would tell her to "shut up" when she cried. She indicated a bruise on her left inner thigh was from Mother hitting her with a belt because she did not clean her

2

room, and two small bruises on her elbow were from Mother hitting her with a belt. A.J. did not remember the last time Mother hit her, but said it was when she was seven years old (she turned seven in January 2024).

A.J. also told the social worker that Father hit her and Courtney hit her in the mouth and pinched her. She was afraid of Father because he hit her. A.J. relayed a time that Father hit her because she played with her sister's nail polish. She indicated that a mark on her wrist was from Father hitting her with a belt. A.J. did not know the source of small bruises on her lower legs, though she said she bruised her ankles roller skating. She explained a burn on her buttocks came from playing with fire on the stove. She stated she felt safe with both parents—except when Father hit her or when she disobeyed Mother.

Mother denied hitting A.J. but admitted to spanking her with an open hand. She disciplined A.J. by "occasionally yelling at her" and taking away television and electronics. Mother could not explain most of A.J.'s injuries, including those on her back or inner thigh, but said the ankle bruises came from skating. She said A.J. often lied and had difficulty at school because of behavioral problems.

Father lived with Courtney, his three daughters and step-daughters, B.W. (19 years old), M.H. (16 years old), and M.W. (eight years old), and his son, D.W. (three years old). Father denied that either he or Courtney hit A.J. and said he disciplined his children by taking away electronics or ignoring them.

Courtney denied the allegations and was "very shocked and upset" by the report. She said Father never hit or verbally abused A.J., and asserted she and Father were more lenient with her than with the other children because A.J. didn't live with

them full-time.  Courtney had not seen any concerning marks on A.J. but noted A.J. was very active and athletic and could get bruises from playing.  She confirmed they disciplined A.J. with stern talks, timeouts, or taking privileges away.  At most, she said, they would " 'pop the kids on the butt once' " after repeated disobedience.  Courtney described A.J. as having emotional regulation issues, a history of lying and stealing, and occasionally acting with malicious intent.

Several people in and close to the family denied seeing abuse.  M.H., Courtney's daughter, and B.W., A.J.'s adult half-sister, both denied abuse, reported feeling safe in the home, and described Father and Courtney positively.  Both M.H. and B.W. said A.J. had a history of lying and being manipulative.  The paternal grandmother, a teacher and mandated reporter with a master's degree in counseling, shared a close bond with the family and denied any concerns about abuse.  She stated the allegations about Father were false.  Father's probation officer, who met with him twice a month, said he was "very respectful and cooperative."  She had interacted with all of the children and never observed signs of abuse or neglect.  She described the children as happy and "so bright and respectful."  A.J.'s daycare provider also had no concerns.  She noted that A.J. struggled with sitting still, sometimes fought with other children, and had caused another child to stop attending daycare.

A.J. was placed with Tina C., a family friend, pending the jurisdiction hearing.  According to Tina, A.J. told her that both parents "whoop[ed] her" and abused her.  A.J. said Mother hit her with a belt, though Tina did not observe bruises suggesting recent abuse.  Tina reported that A.J. had behavioral issues, including lying and hitting other children, and she believed A.J.

4

needed counseling due to trauma and exposure to age-inappropriate experiences.

A.J.'s Hub[1] exam documented several marks on A.J. but stated there was "[n]o medical finding indicative of physical abuse." She had a scratch on her forehead, reportedly from another student, and healed marks the examiner deemed were consistent with accidental injury. During the exam, A.J. stated, "No, my mom does not hit me. I feel safe with my mom." The Department noted A.J. might have withheld information because Mother was present during the exam.

The Department filed a petition requesting the juvenile court assert dependency jurisdiction over A.J. under subdivisions (a) and (b)(1) of Welfare and Institutions Code section 300,[2] based on allegations of physical abuse by both parents. The petition further alleged under section 300, subdivision (b)(1), that Father failed to protect A.J. from physical abuse by Courtney. The juvenile court detained A.J. from both parents and ordered monitored visitation.

B.    *Jurisdiction and Disposition Findings*

In an August 2024 interview Mother denied the allegations in the petition. She described A.J. as attention-seeking and said she made false statements to avoid getting in trouble for the threats she made at school. Mother stated A.J. was always getting hurt, scratched, and bruised. She explained one alleged

---

[1]    The Los Angeles County Medical Hub clinics provide health care for children who are involved with the Department.

[2]    Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

5

burn mark as a keloid scar and attributed other injuries to events that happened after A.J.'s removal. Mother admitted to spanking A.J. "a 'couple times' with an open hand." She denied seeing marks after visits with Father or hearing A.J. complain about discipline.

Father denied the allegations as well. He said he was usually on the phone when Mother disciplined A.J., and he denied any physical abuse, stating, "No one is getting beat or hit or slapped. I might have to talk stern and a cuss word may come out but nah." Father denied Mother would be capable of physical abuse, stating she "goes above and beyond" when it came to parenting. He and Courtney had an unwritten rule never to spank A.J., although Father may " 'give an open pop (open hand) on the butt and that is it.' " Father had an upcoming hearing on non-violent federal charges and expected to be sentenced to prison.

The maternal grandmother had not seen Mother discipline A.J. and denied that A.J. reported abuse by Mother, Father, or Courtney. She had no concerns about any of them but noted her relationship with Mother was "on and off."

In a forensic interview, A.J. said she played "really rough" but denied getting marks from playing. She felt safe at both parents' homes. A.J. said Mother only disciplined her with timeouts and chores and denied telling anyone otherwise. She did not remember what she told the police and said, "I can't remember. My mind is just dizzy right now. I can't remember." A.J. first said Father also only used timeouts but later reported that he "whooped" her and her sister for repeating questions and that he hit her on the arm with a belt. She also stated that

Courtney "pop[ped]" her in the mouth for talking back and pinched her arm.

The forensic interviewer noted A.J. appeared "reluctant to speak, avoidant, and appeared very aware of the cameras by looking at them before she answered certain questions." She minimized or denied her prior disclosures, despite previously giving consistent statements to school staff, the Department, and law enforcement about being hit with a belt and other objects by both parents and being pinched and slapped by Courtney. The interviewer concluded, "Continued [Department] intervention appears warranted."

Later in October the maternal grandmother told the Department that Mother had coached A.J. and that the grandmother had previously withheld this information to protect Mother. The maternal grandmother was concerned about A.J. if she was released to Mother. She had witnessed years of abuse and neglect by Mother, including dropping her son on his head as a toddler and hitting A.J. in the face with a paint roller, leaving a mark between her eyes. Although Mother had claimed her now adult son could not communicate well enough to be interviewed, the maternal grandmother said he held a job, was verbal, and had no such issues.

At the November 2024 jurisdiction hearing the juvenile court sustained the petition. The court stated it had "gone back and forth," but ultimately found A.J.'s initial disclosures credible. Because A.J. "had no problem talking about Father and the stepmother during the forensic interview," the court believed Mother coached A.J. not to say anything about her, which was corroborated by the maternal grandmother. The court concluded, "I think this goes beyond inappropriate physical discipline. The

7

number of objects that were described, the bruises that were left on the child I do think show physical abuse rather than simply inappropriate physical discipline. . . . And yes, she is an active child. Yes, she engages in horseplay. She's got behavioral issues at school. All of those things are true. But in this case, I believe both things are true. I think she was physically abused, and I think the Department has met its burden on that as to both parents and stepmother."

At the disposition hearing the juvenile court declared A.J. a dependent, removed her from both parents, and ordered reunification services. During the hearing, the court stated, "I do believe that this is more a case of the child being intimidated about talking about what happened to her rather than feeling guilty that she brought this to the attention of somebody and is now trying desperately to retract it." Both parents' visitation remained monitored.

Father and Mother timely appealed.

## DISCUSSION

A. *Substantial Evidence Supports the Jurisdiction Findings*

Mother and Father assert we must reverse the jurisdiction findings under section 300, subdivisions (a) and (b)(1), because they were unsupported by substantial evidence. Their contentions are unavailing.

1. *Governing law and standard of review*

Under section 300, subdivision (a), the juvenile court may assert jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." A parent's use of inappropriate physical discipline

8

may support jurisdiction. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1644-1645 [jurisdiction proper under § 300, subd. (a), where mother struck child with a belt, cord, and ruler and left bruises, red marks, welts, and broken skin].) In general, "[w]hether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of [the] parental right to discipline turns on three considerations: (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.' " (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.) The juvenile court also may consider the totality of a parent's disciplinary methods, including past incidents, to determine whether jurisdiction is appropriate. (*In re D.D.* (2019) 32 Cal.App.5th 985, 995.) " 'A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

We review jurisdiction findings for substantial evidence—evidence that is " ' "reasonable, credible, and of solid value," such that a reasonable trier of fact could make such findings.' " (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re J.S.* (2021) 62 Cal.App.5th 678, 685.) A "reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640; see *In re S.A.* (2010) 182 Cal.App.4th 1128, 1149 ["[I]nconsistencies and conflicts in the evidence go to credibility of witnesses and weight of the evidence, which are matters for the trial court."].) "The appellant has the burden of showing there is

no evidence of a sufficiently substantial nature to support the findings." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; see *In re J.S.*, at p. 685.)

       2.     *Substantial evidence supports the jurisdiction findings under section 300, subdivision (a)*

Substantial evidence supports the jurisdiction findings based on Mother's and Father's physical abuse of A.J. A.J. was consistent in her initial reports of physical abuse to her school counselor, the police, and the Department social worker. Those reports were detailed. She stated Mother had hit her with the hard part of a hairbrush and a sandal, and Father hit her with a belt after she played with her sister's nail polish. A.J. further identified specific injuries and explained their causes: She said Mother hit her with a belt on her left inner thigh because she did not clean her room, leaving a bruise; Mother also hit her with a belt on her elbow, leaving two bruises; and Father hit her with a belt, leaving a mark on her wrist. Given that level of specificity—including identifying the objects used and connecting them to particular bruises—the court found A.J.'s initial disclosures reliable. We defer to the juvenile court's credibility findings. (See *In re S.A., supra,* 182 Cal.App.4th at pp. 1148-1149.)

     Further, A.J.'s reports were corroborated. The police observed marks on A.J.'s body, including marks on her wrists and thighs and scars on her back. Tina, who cared for A.J. in July 2024, reported that A.J. told her during the car ride home that Mother "whoop[ed]" her and both parents abused her. The maternal grandmother also described a longstanding pattern of Mother's abuse and neglect, including that Mother threw a paint roller at A.J. when she was four years old, leaving a mark between her eyes.

Mother and Father cite evidence they say undermines the jurisdiction findings, such as that A.J. may have made her initial statements to avoid getting in trouble at school; that her bruises came from horseplay and sports; that she denied abuse by either parent during the Hub exam and by Mother during the forensic interview; and that A.J.'s daycare provider, Father's probation officer, and others denied they suspected abuse. Mother also notes that the maternal grandmother initially denied seeing any discipline or marks and had a strained relationship with her, suggesting the grandmother's later statements were unreliable.

These arguments simply challenge how the juvenile court weighed the evidence. As discussed, we may not " ' " 'reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.' " ' " (*In re Miguel J.* (2025) 114 Cal.App.5th 635, 647.) Rather, our task is to determine if there is substantial evidence, contradicted or uncontradicted, to support the juvenile court's findings. (See *In re Jayden A.* (2025) 111 Cal.App.5th 1334, 1347; *In re J.N.* (2021) 62 Cal.App.5th 767, 774 [" 'we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw' "].) Here, there was.

Moreover, the juvenile court had sound reasons for discounting the contrary evidence. For example, the forensic interviewer observed that A.J. was reluctant to speak, avoided direct answers, and appeared highly aware of the cameras, which the interviewer believed warranted continued Department intervention. Similarly, the Department noted A.J. may not have disclosed abuse during the Hub exam because Mother was present. The maternal grandmother also reported that Mother

11

had been coaching A.J., supporting the court's conclusion that A.J.'s retractions were coached. Nor is absolute consistency in a child's account of abuse required to support a jurisdiction finding. (See *In re I.C.* (2018) 4 Cal.5th 869, 896 ["A child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust."].)

Mother argues A.J. identified only "a couple of bruises" as being caused by her and contends those injuries "should be considered insufficient to sustain the allegation of physical abuse under subdivision (a)." Even assuming A.J.'s bruises were not "serious" injuries, "section 300, subdivision (a) may apply when a minor suffers less serious injuries but there is a history of repeated abuse." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 139.) Here, A.J. described multiple incidents in which Mother hit her with a hairbrush, sandal, and belt, and Father hit her several times with a belt. Mother could not explain visible marks, including scars on A.J.'s back, which could have resulted from prior abuse.[3] The maternal grandmother reported years of mistreatment, including the incident where Mother threw a paint roller at A.J.

Substantial evidence supports the juvenile court's finding that both Mother and Father physically abused A.J.[4] (See *In re*

_____

[3] There were also issues with Mother's credibility. She told the Department her adult son could not communicate well enough to be interviewed, while the maternal grandmother stated he had no such difficulty, held a job, and was "very verbal."

[4] Because substantial evidence supported the allegations in the petition under section 300, subdivision (a), of physical abuse by Mother and Father, we need not address the allegation that Father failed to protect A.J. from Courtney's abuse, or whether

*D.M.*, *supra*, 242 Cal.App.4th at p. 641; *In re A.E.* (2008) 168 Cal.App.4th 1, 3 [substantial evidence supported jurisdiction findings when a parent struck her son with "hard objects, violently enough to leave black and blue bruises"].)

B.    *Substantial Evidence Supports the Removal of A.J. From Father*

Father argues the juvenile court's order removing A.J. from him was not supported by substantial evidence.

Once a court has asserted dependency jurisdiction, it may remove the child from a parent if it finds, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home," and "there are no reasonable means by which the [child's] physical health can be protected" other than removal.  (§ 361, subd. (c)(1).)  In reviewing a finding that must be proved by clear and convincing evidence, we ask "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."

_____

jurisdiction was proper under section 300, subdivision (b)(1). (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence' "]; *In re L.O.* (2021) 67 Cal.App.5th 227, 237 [" 'an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence' "].)

(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.) We view the record in the light most favorable to the finding, resolving all conflicts and drawing all reasonable inferences from the evidence to support the finding. (*Ibid.*)

The same evidence of Father's physical abuse of A.J. also supports the finding, by clear and convincing evidence, that A.J. would have faced substantial danger of serious harm if placed in Father's care. (See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 826 ["[s]ince the evidence warranted a finding of substantial risk of serious physical injury, it also appears to have supported a finding under section 361 . . . of a substantial danger to the minor's physical health"], abrogated on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 629.) Father asserts there were individuals who could have observed A.J. in his home and reported any issues to the Department. However, those individuals did not disclose Father's previous abuse of A.J. Substantial evidence supported the order removing A.J. from Father's custody.

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order removing A.J. from Father are affirmed.

STONE, J.

We concur:

MARTINEZ, P. J.

FEUER, J.

14